## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | |
|---|---|
| KATHLEEN E. BRENNAN and<br>THOMAS BRENNAN,<br><br>     *Plaintiffs*<br><br>*v.*<br><br>CASCO BAY ISLAND TRANSIT<br>DISTRICT,<br><br>     *Defendant* | )<br>)<br>)<br>)<br>)<br>)        *Civil Docket No. 07-138-P-H*<br>)<br>)<br>)<br>)<br>) |

### MEMORANDUM DECISION ON MOTIONS TO EXCLUDE AND RECOMMENDED DECISION ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

In this personal injury action by the plaintiffs against their employer for injuries allegedly sustained while working as deckhands on the defendant's ferry MAQUOIT II, each side has filed a motion to exclude from trial the testimony of an expert witness designated by the other side. The plaintiffs have also filed a motion for summary judgment on the defendant's affirmative defense of contributory negligence, and the defendant has filed a motion for summary judgment on the claims of plaintiff Thomas Brennan.  I recommend that the plaintiffs' motion for partial summary judgment be denied and that of the defendant granted.  I deny the motions to exclude.[1]

### I.  Motions for Partial Summary Judgment

#### A.  Summary Judgment Standard

*1.  Federal Rule of Civil Procedure 56.*  Summary judgment is appropriate only if the

---

[1] The plaintiffs' motion for sanctions for spoliation of evidence (Docket No. 35) was initially referred to me as well, but the outcome of that dispute will have no effect on the outcome of the other four motions.  The plaintiffs seek a permissive negative inference jury instruction at trial regarding an allegedly missing security video and drug and alcohol test results. Under the circumstances, that motion would better be decided by the judge who will preside at trial.

record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

*2. Local Rule 56*. The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material

facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Sánchez-Figueroa v. Banco Popular de Puerto Rico*, 527 F.3d 209, 213-14 (1st Cir. 2008).

**B.  Factual Background**

The following undisputed material facts are appropriately presented in the parties' respective statements of material facts submitted in accordance with this court's Local Rule 56. The facts relevant to both motions for summary judgment are presented together here.

Kathleen Brennan[2] first worked as a deckhand for the defendant or its corporate predecessor after graduating from high school in May 2003.  Plaintiffs' Statement of Undisputed Material Facts ("Plaintiffs' First SMF") (Docket No. 34) ¶ 1; Defendant's Opposing Statement of Material Facts in Response to Plaintiff[]s['] Statement of Material Facts ("Defendant's Responsive SMF") (Docket No. 48) ¶ 1.  She returned to work as a deckhand for the defendant during the summer of 2004, after her first year of college.  *Id*. ¶ 2.  Her responsibilities as a deckhand included loading and unloading passengers, throwing lines, and loading and unloading freight.  *Id*. ¶ 3.  During her second summer as a deckhand, Kathleen spent most of her time working on the MAQUOIT II.  *Id*. 4.

The other deckhands working on the MAQUOIT II ferry boat on August 13, 2004, at 2:15 p.m., were plaintiff Thomas Brennan (Kathleen's brother), Cade Bollier, and Irene Coleman.  *Id*. ¶ 7.  All of the deckhands were seasonal workers.  *Id*.

Nicholas Mavadones is the defendant's operations manager.  *Id*. ¶ 8.  He is responsible for day-to-day operations, shore-side operations, and maintenance operations.  *Id*. ¶ 9.  He was previously a licensed ferry boat captain, but he let his license expire.  *Id*. ¶ 10.  Paul Frager is a full-time captain for the defendant and was the captain of the MAQUOIT II for the 2:15 p.m. run of August 13, 2004.  *Id*. ¶ 11.

Frager started working as a deckhand for the defendant during the summer of 1989 and worked his way up through mate and captain before becoming a senior captain.  *Id*. ¶ 12.  He

---

[2] To avoid confusion, I will refer to the plaintiffs by their first names after each is mentioned for the first time.

worked as a deckhand for Mavodones for many years and learned his current job from Mavodones. *Id.* ¶ 13. He worked as a deckhand on the MAQUOIT II when it first went into service for the defendant in 1994. *Id.* ¶ 14.

To offload a vehicle from the MAQUOIT II to the pier, the defendant uses two different ramps, one for each set of wheels. *Id.* ¶ 16. One is an aluminum "work plank" that is wide enough to roll a pallet on and off the vessel. *Id.* The other is a narrower fiberglass plank. *Id.* After the vessel is in place at the dock, the ramps are deployed and secured to both the dock and the vessel to minimize movement. *Id.* ¶ 17. Once the ramps are secured, chocks are taken out of the tires on the vehicle, and a crew member releases the parking brake and slowly drives the vehicle over the planks and off the vessel while another crew member directs the vehicle to ensure that the wheels are lined up with the planks. *Id.* ¶ 18.

On the 2:15 p.m. run of the MAQUOIT II on August 13, 2004, the ferry picked up an automobile at Chebeague Island. *Id.* ¶ 19.[3] The automobile had bicycles on a roof rack. *Id.* Frager typically would have supervised the offloading of vehicles from the MAQUOIT II, and he felt that the deckhands needed to be supervised in this instance. *Id.* ¶ 21. During the run, Frager had noticed that the radar was not working properly and called Mavadones to tell him that the radar would need to be fixed before the MAQUOIT II departed on its next run. *Id.* ¶ 22. After the MAQUOIT II arrived in Portland, Jeff Sawyer, the defendant's radar repairman, and Mavadones boarded the MAQUOIT II. *Id.* ¶ 23. The MAQUOIT II crew spent approximately 10-15 minutes unloading passengers and freight before turning their attention to the offloading of the vehicle. *Id.* ¶ 24.

---

[3] The defendant purports to deny this paragraph of the plaintiffs' statement of material facts, but its response only denies portions of the paragraph. Defendant's Responsive SMF ¶ 19. I have included only those portions of the paragraph which the defendant does not dispute.

5

Sawyer suggested that he describe how the defendant's employees could fix the radar problem so that they could make the repairs themselves in the future. *Id.* ¶ 25. Mavadones told Frager to record what Sawyer was doing and communicate it to his fellow captains. *Id.* Frager felt that Mavadones had the proper authority to oversee the offloading of the vehicle. *Id.* ¶ 27.

After the deckhands unloaded the freight around the car, they brought down the car plank and arranged the planks for the offloading of the vehicle. *Id.* ¶ 28. Bollier was driving the car and Coleman was directing the car off the vessel. *Id.* ¶ 29. Kathleen was standing with Mavadones and engaging in small talk as the crew prepared to offload the vehicle. *Id.* ¶ 30. While watching the crew, Kathleen observed that the bicycles on the vehicle's roof rack were not going to pass under the overhead bar used to raise and lower the ramp upon which the vehicle had to be driven. *Id.* ¶ 31. She asked Mavadones if she should retrieve the bicycle key lock to remove the bicycles. *Id.* ¶ 32.

Mavadones told Kathleen that they would do what he did when he was a deckhand and stand on the bumper to weigh the vehicle down. *Id.* ¶ 33. While the rear bumper of the vehicle was still over the deck of the MAQUOIT II, Mavadones and Kathleen walked over to the vehicle. *Id.* ¶ 34. Mavadones then got onto the left side of the rear bumper and Kathleen got onto the right side of the bumper, while each held on to the respective sides of the roof bicycle rack. *Id.* ¶ 35. After they were on the bumper, the car moved forward slowly and the handlebars of the bicycles passed underneath the overhead bar attached to the slip. *Id.* ¶ 36. However, the seats of the bicycles still would not fit underneath the overhead bar. *Id.* ¶ 37. Mavadones said that they needed more weight and asked Thomas, who was walking by on Kathleen's side of the car at the time, to stand on the bumper to add more weight. *Id.* ¶ 38.

6

The entire offloading procedure was within Mavadones' field of vision.  *Id*. ¶ 39.
However, before asking Thomas to get on the vehicle's bumper, Mavadones did not look to see
whether there was a handhold in the center of the vehicle for Kathleen.  *Id*.  To make room for
Thomas, Kathleen moved toward the center of the bumper.  *Id*. ¶ 40.   After the car again began
moving, Kathleen slipped backwards off the car and fell in the opening between the water edge
of the pier's concrete ramp, the upper deck of the boat, and the two planks over which the
vehicle was travelling.  *Id*. ¶ 42.  After the accident, Frager told Mavadones that having someone
stand on the bumper was a terrible idea.  *Id*. ¶ 44.

Thomas believes that he did not stand on the bumper, but rather pushed down on it with
his right hand.  Additional Facts ("Defendant's First SMF") (included in Defendant's Responsive
SMF beginning at 7) ¶ 47; Plaintiff's Reply Statement of Material Facts ("Plaintiff's Reply
SMF") (Docket No. 59) ¶ 47.   Thomas's assistance resulted in the car being lowered sufficiently
to allow the bicycles to pass under the overhead bar and the car to be driven onto the pier and
into the freight shed.  *Id*. ¶ 49.   Upon realizing that his sister had fallen, Thomas went
immediately to her assistance and found her to be conscious and able to communicate with him.
*Id*. ¶ 47.   After Kathleen fell, Thomas ran back onto the boat, down the staircase to the lower
deck, and ripped two doors and stanchions off the boat in order to climb down on the piers'
crossbeams to reach her.   Plaintiff's Additional Material Facts in Opposition to Defendant's
Motion for Summary Judgment (included in Plaintiffs' Response in Opposition to Defendant's
Statement of Undisputed Material Facts ("Plaintiff's Responsive SMF") (Docket No. 46)
beginning at 6) ¶¶ 23-24; Defendant's Reply Statement of Material Facts (Docket No. 62) ¶¶ 23-
24.

Mavodones had previously stood on the bumper of a car to offload it successfully from a vessel. Defendant's First SMF ¶ 52; Plaintiff's Reply SMF ¶ 52. He does not consider it an unsafe practice and believes it to be comparable to other practices carried out by deckhands in the course of their duties aboard vessels. *Id*. Frager had previously participated as a deckhand in offloading a vehicle from a vessel with a crew member standing on the bumper to lower the height of the vehicle. *Id*. ¶ 53. That the bicycles were not going to clear the overhead bar after she and Mavodones stood on the bumper was obvious to Kathleen. *Id*. ¶ 54. Kathleen only realized that there was nothing for her to hold onto after she moved to the center of the bumper. *Id*. ¶ 56.

Thomas is six feet four inches tall and weighs about 280 pounds. Defendant's Supporting Statement of Material Facts ("Defendant's Second SMF") (Docket No. 39) ¶ 10; Plaintiffs' Responsive SMF ¶ 10. He suffered from attention deficit hyperactivity disorder prior to Kathleen's injury and began taking medication to control it. *Id*. ¶ 12. The medication caused him to suffer insomnia. *Id*. He has not had flashbacks, nightmares, suicidal thoughts, hallucinations, or panic attacks as a result of witnessing the injury to his sister. *Id*. ¶ 14. He has used the defendant's ferry system since the event. *Id*. ¶ 15. He has not sought treatment for emotional distress since consulting with his expert witness, Dr. Voss. *Id*. ¶ 17. He has not been hospitalized since the date of his sister's injury. *Id*. ¶ 18.

### C. Plaintiffs' Motion

The plaintiffs seek summary judgment on the defendant's affirmative defense of contributory negligence. Plaintiffs' Motion for Summary Judgment on Defendant's Contributory Negligence Affirmative Defense ("Plaintiffs' Summary Judgment Motion") (Docket No. 33) at 1. That defense reads as follows:

>     And Further Answering And As A Complete And Separate Defense,
> the DEFENDANT[] state[s] that if the Plaintiffs sustained injuries as
> alleged, which is specifically denied, then the said injuries were due in
> whole or in part to the Plaintiffs' own negligence and failure to exercise
> the degree of care, skill and knowledge in the performance of their work
> reasonably  to be required of seamen of the Plaintiffs' experience and not
> due to any negligence or fault on the part of the DEFENDANT[] or any
> person for whom the DEFENDANT[] may be responsible.

Defendant[']s[] Answer to Plaintiffs' First Amended Complaint (Docket No. 17) at 6.

The plaintiffs contend that they are entitled to summary judgment on this defense because a seaman may not be held to be contributorily negligent if he or she was carrying out orders that resulted in his or her own injury, "even if he recognizes possible danger," citing *Williams v. Brasea, Inc.*, 497 F.2d 67, 73 (5th Cir. 1974).  Plaintiff's Summary Judgment Motion at 8-9. Addressing the defense only as it is pled against Kathleen's claim, the plaintiffs assert that "it is undisputed that Kathleen . . . was following Mavodones' orders at the time she was injured." *Id.* at 9.  Accordingly, they argue, Kathleen is entitled to summary judgment on this claim. *Id.* at 10.

The defendant responds, Defendant's Opposition to Plaintiffs' Motion for Summary Judgment on Defendant's Contributory Negligence Affirmative Defense ("Contributory Negligence Opposition") (Docket No. 47) at 9-10, that it is not the task of getting onto the bumper in the first place, which Kathleen did at Mavodones' suggestion, but rather the moving to the center of the bumper, where there was nothing for her to hold onto, that caused Kathleen's injury, and that Mavodones did not even suggest that she move, insofar as the summary judgment record demonstrates.

I agree.  The plaintiffs offer the following factual assertions on this point: 1) "Mavadones told Ms. Brennan that they would do what he did in the old days as a deckhand and stand on the bumper to weigh the vehicle down[,]" Plaintiffs' Statement of Undisputed Material Facts

9

("Plaintiffs' SMF") (Docket No. 34) ¶ 33; 2) "Mavadones explained that they just had to put some weight on the bumper to weigh the vehicle down[,]" *id.* ¶ 34; 3) "Mavadones . . . then asked Thomas Brennan, who was walking by on Ms. Brennan's side of the car at the time, to stand on the bumper to add more weight[,]" *id.* ¶ 38; and "[t]o make room for Mr. Brennan, Ms. Brennan then moved towards the center of the bumper." *Id.* ¶ 40.

These statements simply do not establish, as a matter of law, that Kathleen was "following an order to complete a task in a specific manner" when she fell. *Alholm v. American Steamship Co.*, 144 F.3d 1172, 1179 (8th Cir. 1998) (cited by the plaintiffs, Plaintiffs' Summary Judgment Motion at 9). Since Thomas denies that he stood on the bumper, Defendant's Responsive SMF ¶ 48, it is not necessarily the case that "in order for Kathleen to follow Mavadones' specific instructions regarding offloading the vehicle by means of standing on its bumper, she *had* to move to the center of the bumper to accommodate her brother." Plaintiffs' Reply in Support of Motion for Summary Judgment on Defendant's Contributory Negligence Affirmative Defense (Docket No. 58) at 5 (emphasis in original).

The plaintiffs do not mention the apparent assertion of this defense against Thomas's claims, in addition to its assertion against those of Kathleen. The affirmative defense, therefore, remains in place against Thomas. Further, on the showing made, Kathleen is not entitled to summary judgment on this defense. The plaintiffs' motion should be denied.

### D.  Defendant's Motion

The defendant seeks summary judgment on all claims asserted against it by Thomas. Motion for Summary Judgment in Favor of Defendant ("Defendant's Summary Judgment Motion") (Docket No. 38) at 1. All of the counts in the first amended complaint are asserted by Thomas as well as Kathleen. Complaint ¶¶ 35-51. Thomas's claimed damages appear to be

limited to emotional distress. *Id.* ¶ 29. The defendant contends that, under applicable admiralty law, Thomas may not recover for the emotional distress he claims to have suffered because he was not placed in immediate risk of physical harm, was not imminently threatened with physical harm, and did not suffer any physical injury. *Id*. at 6-10.

    *1. The Applicable Legal Standard.* The parties agree that negligent infliction of emotional distress is a cognizable claim under the Jones Act in particular and admiralty law in general. Defendant's Summary Judgment Motion at 5; Plaintiffs' Response in Opposition to Motion for Summary Judgment in Favor of Casco Bay Island Transit District ("Plaintiffs' Opposition") (Docket No. 45) at 5. The parties' submissions make clear that they also agree that recovery for emotional distress may be obtained under any and all of the counts asserted in the first amended complaint.

    The parties' first dispute concerns whether the zone of danger test established by the Supreme Court in *Consolidated R.R. Corp. v. Gottshall*, 512 U.S. 532, 554 (1994), applies to Thomas's claims in this case. The *Gottshall* Court stated that

> the zone of danger test limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct.

*Id*. at 547-48. *Gottshall* considered claims brought under the Federal Employers' Liability Act ("FELA"), and the defendant asserts that it "therefore" applies to Jones Act cases as well. Defendant's Summary Judgment Motion at 6. This is perhaps an implied reference to *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 547 (1960), in which the Supreme Court suggested that the Jones Act and FELA create the same cause of action for railroad workers and seamen, so that case law developed under either statute should guide subsequent interpretation of the other. The plaintiffs disagree, contending that, because Maine law applies a "relative bystander" test in

11

cases alleging negligent infliction of emotional distress, this court should import that standard into claims arising under the Jones Act in Maine.  Plaintiffs' Opposition at 6-7.

In *Ellenwood v. Exxon Shipping Co.*, 795 F. Supp. 31 (D. Me. 1992), an opinion that pre-dated *Gottshall*, Judge Hornby of this court held that, under then-existing First Circuit precedent,

> a physical injury is still required to recover emotional distress damages under FELA.  Since the Jones Act incorporates FELA standards for liability, *Bullard* [ *v. Central Vt. Ry.*, 565 F.2d 193 (1st Cir. 1977)] must be read as recognizing a general congressional policy limiting maritime recovery for negligent infliction of emotional distress to those claims based on physical injury.

795 F. Supp. at 34.  On appeal, the First Circuit agreed that case law developed under FELA guides interpretation of Jones Act claims, *Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1281 n.15 (1st Cir. 1993), but declined to hold explicitly that a seaman may recover emotional distress damages without showing a physical injury, because of the parties' "lack of attention" to the claim of negligent infliction of emotional distress before and during trial.  *Id*. at 1282-83

Seventeen months later, the Supreme Court in *Gottshall* held that the zone of danger test applies to claims for emotional injury brought under FELA, and described the test as limiting such recovery "to those plaintiffs who sustain a physical impact . . . or who are placed in immediate risk of physical harm" by a defendant's negligent conduct.  512 U.S. at 547-48. Given the most recent pronouncements of this court and the First Circuit on the interrelated nature of FELA and the Jones Act, as well as claims brought under general maritime law, I conclude that this court should not depart from the Supreme Court's position.  *See generally Smith v. Carnival Corp.*, 2009 AMC 563, 576-80 (S.D. Fla. 2008).

Nothing in *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398 (9th Cir. 1994), on which the plaintiffs rely, Plaintiffs' Opposition at 5-7, causes me to question this conclusion.  Indeed, the Ninth Circuit in *Chan*, declined to decide which test to adopt on the emotional distress claims

12

brought under general maritime law by the plaintiffs in that case, because the plaintiffs claiming emotional distress damages were not present at the accident scene. 39 F.3d at 1409-10. *See also Tassinari v. Key West Water Tours, L.C.*, 480 F.Supp.2d 1318, 1320 (S.D.Fla. 2007) (claim of negligent infliction of emotional distress under maritime law must survive zone of danger test).

2. *Application of the Zone of Danger Test.* The plaintiffs concede that Thomas did not sustain a physical injury at the relevant time. Plaintiffs' Opposition at 9. The summary judgment issue, therefore, is whether a reasonable factfinder could conclude, based on the evidence properly before the court, that Thomas was placed in immediate risk of physical harm by the same allegedly negligent conduct that led to Kathleen's injuries.

The defendant contends that he was not. Defendant's Summary Judgment Motion at 7-8. The plaintiffs argue that Thomas was placed in immediate risk of physical injury "because Mavadones asked Thomas to stand on the bumper of a moving vehicle that was being offloaded to further weigh it down." Plaintiffs' Opposition at 9. But the plaintiffs concede that Thomas himself testified that he did not stand on the bumper but rather pushed down on the bumper with his hand. Defendant's SMF ¶ 7; Plaintiff's Responsive SMF ¶ 7.[4] The plaintiffs attempt to place Thomas in immediate risk of physical danger by contending that he was "standing on the narrow plank, immediately adjacent to the gap into which his sister would soon fall." Plaintiffs' Opposition at 9. The gap between the two planks, the vessel, and the pier, through which Kathleen fell, was small. Defendant's SMF ¶ 11; Plaintiff's Responsive SMF ¶ 11. Thomas is six feet, four inches tall and weighs about 280 pounds. *Id*. ¶ 10. Unlike Kathleen, he could not

---

[4] The plaintiffs cite only to their responsive statement of material facts in support of their position on this point. Opposition at 9. Because the moving party has no opportunity under this court's local rule to reply to the facts alleged in a qualification or denial of a paragraph of its statement of material facts by the non-moving party, this practice cannot be permitted. In order to rely on facts other than those included in the moving party's statement of material facts, a non-moving party must include those facts in its own statement of additional material facts, submitted with its memorandum of law, to which the moving party does have an opportunity under Local Rule 56 to respond.

at any time have been located directly over the gap.  Mavodones, the most experienced of the three individuals involved in the incident, testified that he did not believe that either he or Thomas could have fit through the opening through which Kathleen fell.  Deposition of Casco Bay Island Transit District by Nicholas Mavodones and Nicholas Mavodones, Individually (Exh. D to Defendant's SMF) at 103 (cited as authority for ¶ 11 of Defendant's SMF), and David C. DuBois, an expert witness for the defense whose testimony was also cited in support of this paragraph of the defendant's statement of material facts and whose testimony on this point has not been challenged by the plaintiffs, testified that

> it's an extremely unique set of circumstances for this to have happened the way it happened.  The opening which she fell through, she had to be in the right spot at the right moment in time and slip at exactly that period of time.
>
> * * *
>
> The vessel was probably a foot to a foot-and-a-half away from the dock; and the space through which she fell had to be – she had to be positioned exactly over it at exactly that moment of time.  If she had slipped off the bumper a split-second before or a split-second after, she wouldn't have gone through that opening.  She would have landed on the – on the deck of the vessel or on the dock.

Deposition of David C. DuBois (Exh. E to Defendant's SMF) at 60-61.  Thomas could not possibly have been at the same point as Kathleen at the same time that she fell.  There is no evidence in the summary judgment record that would allow a reasonable factfinder to conclude that Thomas was in immediate risk of physical injury at any relevant time.

The plaintiffs' final argument on this issue is that Thomas's hands could have "slipped off the bumper as the car moved forward," so that "he still could have injured himself by falling forward onto the work plank or onto the steel deck."  Plaintiffs' Opposition at 10.  There is simply no evidence in the summary judgment record to support this speculation.  Even if such an injury, caused by a fall far different from that which caused Kathleen's injury, could serve as the

physical harm of which there was an immediate risk while Kathleen was being injured, there must be more than speculation to support its imminence.  No such evidence is offered here.

This conclusion makes it unnecessary to consider whether Thomas must also show a physical manifestation of his alleged emotional injury in order to recover under the Jones Act or general maritime law, an issue on which the case law conflicts.  *See Tassinari*, 480 F.Supp.2d at 1321-25 (discussing case law and concluding that physical manifestation is required).

The plaintiffs also contend that the defendant's brief "solely focuses on [Thomas's] Jones Act claim," so he is not entitled to summary judgment on his claims arising under general maritime law and his unseaworthiness claims.  Plaintiffs' Opposition at 12.  The defendant responds that "[a]ny claims under these causes of action are dependent upon physical injury," and that "[s]tand[-]alone emotional distress is limited to those situations addressed in defendant's brief."  Defendant's Response to Plaintiff[]s['] Reply in Opposition to Defendant's Motion for Summary Judgment (Docket No. 61) at 5.  The defendant's motion, fairly read, refers both to claims under the Jones Act and claims under general maritime law.  Defendant's Summary Judgment Motion at 5-6.  Unseaworthiness is pled as a separate claim, Complaint ¶¶ 43-45, but unseaworthiness is a general maritime law theory.  *Poulis-Minott v. Smith*, 388 F.3d 354, 366 (1st Cir. 2004).  Therefore, any of the defendant's arguments concerning the requirements of general maritime law necessarily apply to the unseaworthy claim asserted by Thomas.

On the showing made, the defendant is entitled to summary judgment on the claims of Thomas Brennan.

## II. Motions to Strike

### A. Plaintiff's Motion

The plaintiffs seek to exclude from trial "certain testimony of [the defendant's] economics expert, Peter Ashton."  Plaintiffs' Motion to Exclude Certain Testimony of Peter Ashton ("Ashton Motion") (Docket No. 36) at 1.  They contend that Ashton "has no qualifications to offer an opinion regarding the causal link (or lack thereof) between Kathleen's injury and her inability to get into medical school or her chances of getting into medical school in the future."  *Id.* at 7.  They fault Ashton for "simply adopt[ing]" another expert witness's opinion about Kathleen's medical condition.  *Id.*  They allege that he has no "specialized expertise in medical school admissions," which they contend is required under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  *Id.*  They contend in the alternative that Ashton's proposed testimony will not assist the jury because he is "no more qualified than the jury to consider the testimony of Dr. Kolkin and Plaintiffs' experts and then reach a conclusion."  *Id.* at 8.

The defendant responds that the plaintiffs' arguments go to the weight to be given to Ashton's testimony rather than its admissibility, and that the plaintiffs' own expert witness uses the same research methodology that they criticize Ashton for using.  Defendant's Opposition to Plaintiff[]s['] Motion to Exclude Portions of the Testimony of Peter Ashton ("Ashton Opposition") (Docket No. 54) at 3-5.  I agree with the former contention and express no opinion as to the latter.

It is in the nature of expert opinion testimony to rely on the relevant expert opinions of others.  *See, e.g., Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 9 (1st Cir. 2001).  This cannot be a reason to exclude the expert testimony at issue.  In addition, the

plaintiffs define the required area of expertise too narrowly.  If a witness with personal experience in medical school admissions were the only witness who could testify on the questions of whether Kathleen's injury caused her application or applications to medical school to be rejected, or wait-listed, and whether she is likely to be admitted to medical school in the future, the plaintiff's expert, Dr. Doiron, most likely could not offer his opinion either on those questions.[5]  This observation is relevant here because the First Circuit has said that "expert witnesses need not have overly specialized knowledge to offer opinions."  *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006).  If a neuro-psychologist can testify about the likelihood that the plaintiff will be accepted by a medical school based in part on information he gleans from a computer search, surely an economist, who relies in part on the same source of information and is in the business of opining on probabilities, can do the same.  In *Levin*, while upholding the trial court's exclusion of that portion of an expert antiques appraiser's opinion that concerned the origin of the clock at issue because he had insufficient experience with furniture of that era, the First Circuit also observed that the court could have allowed that testimony, and the appeals court would have upheld that ruling as well.  459 F.3d at 79.

The plaintiffs' motion to exclude any testimony by Ashton as to the likelihood of Kathleen's admission to medical school, and any causal relationship between her injury and any rejections of such applications that she may have received, is denied.

## B.  Defendant's Motion

The defendant asks the court to exclude any and all testimony by Jeffrey Fisher, designated by the plaintiffs as an expert on possible negligence by the defendant in several specific respects.  Defendant's Motion to Exclude Testimony of Jeff[re]y Fischer ("Fischer

_____

[5] I rely in this regard on the excerpt from Dr. Doiron's testimony that is reproduced at page 3 of the Ashton Opposition.

Motion") (Docket No. 40) at [1]-[3].  It contends that Fischer "attended his deposition without any foundation for his opinions . . . and professed an inability to opine based upon his own failure to review materials or consider the topics for which he was designated."  *Id*. at [3].  It characterizes the cross-examination of Fischer by the plaintiffs' attorney as "lead[ing him] through" testimony for which "plaintiff[]s['] counsel . . . provided the answer in the question or [Fischer] suddenly came up with opinions he previously testified he did not have a foundation to give."  *Id*. at [7].  The defendant argues that any testimony by Fischer must be barred because he employed no methodology in reaching his opinions, which "cannot be reasonably assessed for reliability."  *Id*. at [8].[6]

The plaintiffs respond that Fischer is a first-time expert witness, that the defendant's attorney asked him "confusing and misleading questions," and that the defendant's attorney chose not to follow up on Fischer's cross-examination testimony at the deposition, "apparently in an attempt to exploit a 'gotcha' situation[.]"  Plaintiffs' Response in Opposition to Motion to Exclude Testimony of Jeffrey Fischer ("Fischer Opposition") (Docket No. 44) at 1-2.

The plaintiffs appear to find objectionable the defendant's attorney's continuing to question Fischer based on their expert designation after it became clear that Fischer was not familiar with it.  *Id*. at 9-10.  An expert witness should be familiar with the designation concerning him or her, and his or her anticipated testimony, that is supplied to the opposing party.  The very reason that a detailed designation is required is to allow the opposing party to conduct discovery guided by that information.  Examining counsel is clearly entitled to conduct the deposition of an opposing party's expert witness with the benefit of a Rule 26 summary of

_____

[6] The defendant provides a discussion of the requirements of Fed. R. Civ. P. 26(a)(2) for an expert witness designation, Fischer Motion at [8]-[9], but that has only indirect bearing on the testimony of an expert witness at deposition, which is what is at issue here.

the expert's opinions and cannot be hobbled by opposing counsel's failure to prepare an expert witness adequately for deposition.

That said, I am aware of no requirement that an expert witness may only set forth his opinions and the foundations of those opinions during direct examination at deposition, and not cross-examination. Indeed, any such rule would encourage gamesmanship, as the opposing counsel could choose not to elicit certain opinions and later seek to have those opinions excluded at trial.

In any event, I have read the transcript of Fischer's deposition. I do not find the questions of counsel for the defendant to have been particularly confusing or misleading on direct examination. Nor will I speculate about counsel's possible motive for not questioning Fischer more extensively after he was cross-examined. Finally, I find nothing objectionable about that cross-examination.

If Fischer testifies at trial, and if he attempts to offer opinions that cannot reasonably be said to be encompassed within those offered at deposition, then, if objection is made, it is possible that the trial judge may decide to exclude those opinions. A party may not bring an unprepared expert to deposition and then prepare him or her to testify for trial thereafter, unfettered by the expert's deposition testimony. Such an approach would elevate game-playing over basic fairness and the search for the truth, which is the purpose of litigation. But those are considerations appropriate for the trial judge, at the time of trial. At this point, there is no reason to exclude all of Fischer's anticipated testimony.

The defendant's motion to exclude the testimony of Jeffrey Fischer is denied.

### III.  Conclusion

For the foregoing reasons, the plaintiffs' and the defendant's motions to exclude (Docket Nos. 36 and 44, respectively) are **DENIED**; and I recommend that the plaintiffs' motion for partial summary judgment (Docket No. 33) be **DENIED,** and the defendant's motion for partial summary judgment (Docket No. 38) be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 11th day of May, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge